# STANDARD STAMPING COMPANY, Appellant, v. HEMMINGHAUS et al.

## Division Two, June 12, 1900.

**Builder's Contract:** MATERIALS: LATENT DEFECTS: TESTS: INSPEC-
TION BY ARCHITECT: ACCEPTANCE: DAMAGES: WAIVER: IN-
STRUCTIONS. Plaintiff who had contracted with defendants
for the erection of a five-story building, the flooring of which
was to be two-inch white oak, well seasoned, level and closely
joined, sued on the bond, alleging a breach, and that the flooring was
green, not seasoned, and warped after the building was finished, and
otherwise was not such as was required by the contract, and that the
defects were latent and could not have been seen or known by plain-
tiff at the time said building was completed and the final payments
made to defendants. The answer joined issue and alleged that before
the flooring was laid it was fully inspected by the plaintiff and the
architect, who was plaintiff's agent, and who had full power to reject
any and all material that should not be in strict accordance with said
contract, and that the material was not incorporated into said build-
ing until accepted by him, and after said building was completed
the whole was accepted. *Held*, that the court did not err in in-
structing the jury that if prior to laying the flooring a controversy
arose as to the character of the material, and the architect rejected
it, and thereupon contractors procured other white oak flooring
and before using it submitted it to the inspection of plaintiff and
the architect, and they in the presence of the contractors inspected
it and then and there pronounced it all right and just what
they wanted, and thereupon defendants put it in the floor, then
plaintiff waived any defect in said lumber which could have been seen
and any latent defect which by the exercise of the precautions
or tests known to architects of ordinary skill and experience in that
locality could have been discovered, but on the other hand if the
contractors furnished material containing defects which could not be
detected by observation and inspection by such an architect, then
the contractors were liable though they acted innocently and though
the building had been accepted and paid for.

Appeal from St. Louis City Circuit Court.—*Hon. Jacob .
Klein*, Judge.

AFFIRMED.

· *Boogher & Taylor* for appellant.

(1)   The court erred in refusing the instructions offered by plaintiff.   Burke v. City of Kansas, 34 Mo. App. 580; Johnson Co. v. Lowe, 72 Mo. 637; Lewis v. Yagel, 77 Hun. (N. Y.) 347; Bonesteel v. Mayor, etc., of N. Y., 22 N. Y. 167; Glacius v. Black, 50 N. Y. 150; Woodruff v. Railroad, 108 N. Y. 48; Adlard v. Muldoon, 45 Ill. 195; Rex v. Peto, 1 Young & Jarvis' Reports, 37; Stuart v. Cambridge, 125 Mass. 109; McIntosh v. Hastings, 156 Mass. 348; Baltimore Cemetery Co. v. Coburn, 7 Md. 202; Bond v. Mayor, etc., of Newark, 19 N. J. Eq. 382; Jones v. Queen, 7 Can. Supt. Ct. Rep. 600; Flesh v. Christopher, 11 Mo. App. 491; Ahern v. Boyce, 19 Mo. App. 556; Halpin v. Manny, 33 Mo. App. 388; Mohney v. Reed, 40 Mo. App. 99; Boteler v. Roy, 40 Mo. App. 234; C. P. Deatherage Lumber Co. v. Snyder, 65 Mo. App. 568; Oberlies v. Bullinger, 75 Hun. (N. Y.) 253; Fitzgerald v. Moran, 141 N. Y. 419; Hartupee v. Pittsburg, 97 Pa. St. 107; Mitchell v. Wiscotta Land Co., 3 Iowa, 209; Supervisors, etc., v. Patrick, 54 Miss. 240; The Queen v. Starrs, 17 Can. Supt. Ct. Reports, 128; Lloyd on Law of Building and Buildings, p. 17, sec. 12 (Ed. 1894); 2 Am. & Eng. Ency. of Law (2 Ed.), p. 820; Trustees, etc., v. Broadfield, 30 Ga. 1; Yeats v. Ballentine, 56 Mo. 530; Haysler v. Owen, 61 Mo. 270; Smith v. Brady, 17 N. Y. 173; Van Buskirk v. Murden, 22 Ill. 446; Gallagher v. Mintum, 50 N. Y. Sup. 491; Mechanics' Bank v. Schaumburg, 38 Mo. 228; State v. Bank, 45 Mo. 528; Glass v. Rowe, 103 Mo. 513; Mechem on Agency (Ed. 1889), sec. 308.   (2)  The entire record of this case shows that the theory of the trial court and the theory of plaintiff's counsel were utterly at variance and unalterably opposed to each other.   Under the court's theory, the defendants were not liable for furnishing labor or materials at variance with the terms of the contract and specifications,

Stamping Co. v. Hemminghaus.

provided plaintiff's architect knew of such variance or could, by the exercise of the care of an ordinarily skillful and experienced architect, have discovered the same.   On the other hand, plaintiff's counsel contended for the rule that, without plaintiff's knowledge and consent, the architect could consent to the incorporation in that building of nothing except what was strictly in accordance with the terms of the contract and specifications; that the written contract, of which the defendants as parties thereto had knowledge, set the bounds and limitations of his authority; and that if in dealing with defendants, he stepped outside of the boundaries therein prescribed, such act or acts were unauthorized and would not bind this plaintiff.   Burke v. City of Kansas, 34 Mo. App. 580; Johnson v. Lowe, 72 Mo. 637; Lewis v. Yagel, 77 Hun. (N. Y.) 337; Bonesteel v. Mayor, etc., of N. Y., 22 N. Y. 162; Glacius v. Black, 50 N. Y. 150; Woodruff v. Railroad, 108 N. Y. 48; Adlard v. Muldoon, 45 Ill. 195; Rex v. Peto, 1 Young & Jarvis' Reports, 37; Stuart v. Cambridge, 125 Mass. 109; McIntosh v. Hastings, 156 Mass. 348; Baltimore Cemetery Co. v. Hastings, 7 Md. 202; Bond v. Mayor of Newark, 19 N. J. Eq. 382; Jones v. The Queen, 7 Can. Sup. Ct. Rep. 600; Trustees, etc., v. Broadfield, 30 Ga. 1; Mechanics' Bank v. Shaumburg, 38 Mo. 228; 2 Am. & Eng. Ency. of Law (2 Ed.), p. 820; Lloyd on Law of Building and Buildings (Ed. 1894), secs. 12 and 17; Mechem on Agency (Ed. 1889), sec. 308.

*Lubke & Muench* for respondents.

(1)   Appellant's entire brief and argument loses sight of the real issue in the cause.   By its amended petition, the appellant bases the right to recover upon the assertion that the defects complained of were:  "Not visible or open to inspection, were latent, and could not have been, and were

not known to plaintiff at the time said floor was laid, nor at the time said building was completed, and the final payment made to defendants, Hemminghaus & Vollmer." Upon this issue was joined, and the counter assertion made that the material was fully inspected by appellant, and by the person whom the contract made appellant's *alter ego*; that the material was thereupon incorporated into the building at great expense, and that, in turn, the building was accepted when completed. When thus viewed, nearly all the decided cases quoted in appellant's brief became wholly inapplicable. Most of these are to the effect that a mere acceptance of a building, without more, is not a waiver of defects, especially if latent; that an architect, because an architect, has no power to change the contract between the owner and the builder; or that the architect can not exceed the powers which are vested in him by the terms of his employment. (2) What the trial court held in this case was, that if the architect and the owner were given full opportunity to inspect, and reject, any and all material and work furnished by the contractor, and that, after such inspection, they deliberately accepted something which was not in strict compliance with the contract and specifications, then, as to everything that was obvious, the owner is now bound. On the other hand, the trial court ruled, that if the contractors furnished any material containing defects which could not be detected by an architect of this vicinity, through the use of ordinary skill, then the contractors are liable to respond in damages to the owner, even though they acted innocently, and notwithstanding acceptance of the building by the owner. Hartupee v. Pittsburg, 97 Pa. St. 107; Lewis v. Yagel, 77 Hun. (N. Y.) 337; Van Buskirk v. Murden, 22 Ill. 446.

GANTT, P. J.—This is an appeal from a judgment of the circuit court of the city of St. Louis on a verdict in be-

half of defendants. The action was brought on a bond for the performance of a builders' contract whereby defendants undertook to and did build a five story factory building in the city of St. Louis, on the northwest corner of Second and Chambers streets.

The substantive portion of the petition is as follows: "That a certain clause of the specifications, which were part of the contract, provided that 'the first floor over the cellar to be laid with best quality white oak, two inches thick, tongued and grooved, flooring laid down level, with close joints, and securely spiked with twenty penny spikes to each joist; balance of first floor of factory and warehouse to be laid with two inches thick, best quality, white oak, dressed to an even thickness, all laid down level, with close joints, and well spiked with twenty penny spikes to each support; every joint of floor to be broken and flooring to be four and one-half inches wide and under.'

"Another clause required 'all materials to be of the best of their respective kinds.'

"That defendants did erect the buildings so contracted for, but not in accordance with said plans and specifications, by not using the best materials of their respective kinds in constructing the five floors of the building; that, in laying the first floor over the cellar, they did not use the best quality of white oak, two inches thick, tongued and grooved flooring, nor lay the same down level, with close joints, and securely spiked with 20 penny spikes to each joist. That said floor was laid while green; has since shrunk and warped, so that it is rough, not level, and has cracks of great width and length; that, in the portion over the cellar, one can see through the floor, and all the balance of the first floor of the factory and warehouse is not laid with two inches thick, best quality of white oak, dressed to an even thickness, laid level, with close joints, well spiked with 20 penny spikes to each

support, but was laid while green, has warped and shrunk, leaving cracks and crevices, is rough and uneven, making inclines therein, and rendering it unfit for the purposes of its construction.   That, on all the first floor, the ends project from the general level; a large number of joints are not broken and many pieces are more than four and one-half inches wide, and not of even two-inch thickness after dressing.   That these defects were latent, not visible, nor open to inspection, and could not have been known, nor were they known to plaintiff at the time of laying the floor, or completing said building, or making the final payment, but only became visible subsequently; that the building has never been accepted by the owner with knowledge of said defects, nor were the terms of the contract waived."

Plaintiff also, alleged performance of the contract on its part, and prayed judgment on the bond for $3,000, on account of the alleged breach.

The answer to this amended petition admitted the execution of the bond and contract, but denied that the latter is fully set forth in the petition.   Affirmatively, the answer averred, that, under said contract, all the work and materials to be furnished by defendant should be so furnished to the satisfaction of the superintending architect of plaintiff, who was by the contract made the agent of plaintiff in the erection of such improvements.   That said superintendent was thereby expressly vested with full power and authority to reject any work or material which might not be in accordance with the letter and spirit of the contract, provided he should notify defendants of his objections at the time the work or materials were being furnished.   That all work and material was furnished under the superintendence and direction of Gerhard Becker, plaintiff's architect, including all the flooring now complained of.   That all the flooring was fully submitted to the inspection and approval of said archi-

tect, and only after his express approval was the same incorporated into the building, at great expense.   That after completion of the building, plaintiff formally accepted the same and the architect fully approved and accepted the entire improvements, and defendants gave up possession thereof in consideration of such approval.

The reply admitted the contract as pleaded, but denied the legal effect as averred.   Also denied approval of the material in question, and averred that the last payment was made by plaintiff, upon promise of defendants to make such additions, alterations or repairs as would be satisfactory to plaintiff if it was discovered later that the building was not erected according to contract.   The cause was tried before Judge Klein and a jury.

The contract was read in evidence and contained the clauses set out in the petition, and among other provisions the following:

"The entire balance of the work to be in accordance with the drawings, plans, elevations and specifications furnished by the superintending architect, and adopted for said building which are hereto annexed and made a part of this contract.   And said superintending architect shall be the agent of the party of the first part in the erection of the building and improvements herein named......And the said superintendent shall have full power and lawful authority to reject the whole or any part or portion of said material or work which may not be in strict accordance with the letter and spirit of these presents; provided, the said superintendent notifies the parties of the second part of his objections to the work and material at the time same are being furnished......Payments to be made as the work progresses, as follows:   $5,000 when the first floor joist is laid and rubble masonry is completed; $5,000 when the second floor joist is laid; $5,000 when the third floor joist is

laid; $5,000 when the fourth floor joist is laid; $5,000 when the fifth floor joist is laid; $9,000 when the roof is on, and the balance of $12,000 when the buildings and all work connected with same is completed. And after the completion of said building, according to contract, if payment of the amount due from party of the first part to parties of the second part be not made within ten days after demand for same, then, in case said parties of the second part shall have recourse to legal process to collect said amount due from said party of the first part, there shall be allowed by the court trying said cause a reasonable attorney's fee in favor of parties of the second part......It shall be the duty of said superintendent, upon any payment becoming due said parties of the second part, to give orders on the owner for the payment of same, duly signed and sealed by the parties thereto."

It was further shown that the building has a front on the west line of Second street of 187 feet by 147 feet on Madison street. Under the corner of the building for a space of sixty feet each way was a cellar nine feet deep, the bottom of which was left in its natural state except a covering of cinders. Over the whole of this cellar was the tongued and grooved white oak flooring and in the corner an office about twelve feet square partitioned off and covered with oil cloth. The remainder of the first floor was composed of the ungrooved white oak plank, dressed on top, two inches thick and nailed to sleepers five inches square which lay next to the unexcavated ground, the spacing between the sleepers being filled with a mixture of cinders and cement.

With reference to the oak floor, plaintiff's proof was that George Wiegand, the managing officer, was on the premises every day as well as the architect. That a shipment of oak flooring was received at the building, which, on examination by the architect, was rejected as not being of

the full thickness required. That thereupon defendants procured other oak flooring and planks, which Wiegand and the architect saw and consulted about when it arrived. Wiegand asked the architect whether this was now what he wanted, and the architect replied that "this was all right." Wiegand does not recollect whether defendant Hemminghaus, heard this colloquy. However, Wiegand.saw the men laying this .floor. He "spent a great deal of time at the building, and kept very close tab on it." He saw Becker examining this flooring and Becker said it was what he wanted.

On about May 5th, defendant Vollmer presented the Architect's order for the final payment of $12,000, but Wiegand took the ten days' grace allowed him by the contract to see if everything was all right. Some time before this, the building being substantially complete, plaintiff had begun to move into it with machinery and material. When Vollmer presented the order, Wiegand called his attention to a number of little things which were not complete, which were thereupon remedied at once. On May 15, the order was again presented for payment, and then Wiegand called Vollmer's attention to some coverings over areas that he wanted made. On the latter's promise to supply these, and the further statement, that "if anything goes wrong with the building, he would be very glad to finish it, or complete it," the order was paid. Some months after that, the floor began to show signs of contraction and warping, and seams showed between boards, and the sides and ends curled up. The part not over the cellar is not all broken-jointed. On prying up the ends of the boards, they were found not full two inches in thickness. In that part laid in the factory and warerooms, where heavy machinery is located or heavy goods piled, and heavy trucks are run, the floor has sunk in places from four to six inches. It is more difficult to work on the floor in its present condition. Some witnesses also testified

that, in its present state, the lasting qualities are not so great as if it had remained smooth and level, as it was when first laid.

When the building was commenced, it was discovered that the portion nearest the corner of Second street was a filled-up quarry, and a great many piles had to be driven to furnish adequate foundations.

An architect, examined for plaintiff, testified that, in his opinion, the lumber used was a first class quality, but not sufficiently seasoned when laid, thus causing the shrinkage and warping. He also testified that this unseasoned condition might have been discovered by any one of a number of well known tests; and that any experienced person, and certainly an architect, should have been able to detect this unseasoned condition "if he had his wits about him." This witness also stated that the portion of the floor in the office where covered with oil cloth, has stood very well, without shrinking, but that the entire floor resting on sleepers, has sunk somewhat, "due presumably to the weight which has been placed upon it." The entire first cost of such a floor would be about $1,600.

For the defense, it was shown that, under the larger part of this building, the soil was "made ground," wet and soggy. That such dampness will arise through even cinders and cement, and will cause the lumber above it to curve and warp. That oak wood is especially susceptible to such influences, and that, with dry heat from above and dampness from below, this result is inevitable. That the oak necessary for covering the first floor arrived at the building, but, as it had been made out of two-inch lumber, which by dressing, was reduced to one and seven-eighths inches in thickness, the architect rejected it, and thereupon an entirely different lot was ordered, planed down from 2 1-2 inch material. When this arrived, it was exhibited to the architect,

and by him shown to Mr. Wiegand, the managing officer of plaintiff corporation, when the first of it was laid. They examined and approved it, and thereupon it was all laid. It took a week to lay it, and Wiegand and the architect were there every day. When all nailed down, the ends of boards at joints were dressed down to make the entire floor smooth. Wiegand and defendant, Hemminghaus, inspected the entire building on April 10th or 12th. Wiegand wanted some little things yet done, and they were done next day. About May 3d, Wiegand, Becker and Hemminghaus again went over the entire building, and after some objections (other than as to floor) by Wiegand, the architect gave the final order, which Vollmer afterwards presented for payment. Plaintiff began moving heavy machinery and materials into the building even before April 10th.

Defendants further showed that the lumber was also examined and measured by Mr. Gruner of the firm through whom the lumber was ordered, and it was found to be of first-class quality, two inches in thickness, and dry—having been dried by the process of nature; had been stacked at the mill for months. He had been in the business long enough to know by handling and lifting whether lumber is dry.

It was also shown that all joints in the first floor were broken, whether made of flooring or planks. By the expression "flooring" is meant tongued and grooved flooring in the trade. And it was shown that at the time when defendant, Vollmer, presented the final order for payment, Wiegand made merely a specific request for the area covers. But Vollmer told him if there was anything else unfinished he would complete it.

During the trial, the court indicated by its rulings that if the plaintiff, by its architect and proper officers, did inspect the material that went into this floor, and also inspected the floor during the laying thereof, and after its

VOL. 157 mo—3

completion, then it could complain only of such latent defects in the work and material as could not have been discovered by ordinary skill.

At the close of the evidence, the court gave the following instructions in the case:

"1.   If you find and believe from the evidence that the oak floor over the cellar and in the remainder of the first story of the factory building constructed by the defendants, Hemminghaus and Vollmer, for the Standard Stamping Company, was not laid in the manner prescribed in the specifications read in evidence, or that the material, viz., the white oak, tongued and grooved, and white oak boards, of which the same was constructed, was not of the best quality for such flooring and boards as required by said specifications and the building contract read in evidence, and if you further believe from the evidence that the floor as laid was of less value on the 11th day of September, 1893, than it would have been if the same had been laid in the manner and of the kind of materials required by the specifications and contract read in evidence, then you should find a verdict in favor of the plaintiff.

"But, although you may find the facts to be as above supposed, if you find and believe from the evidence that a controversy had previously arisen between Mr. Becker, the plaintiff's architect, and the contractors, Hemminghaus & Vollmer, in regard to the white oak, tongued and grooved flooring, and the white oak boards to be used in said floor according to the terms of said contract and specifications, and that the architect had rejected the flooring first delivered at said building for first floor, and that thereupon the contractors procured other white oak flooring and boards to be delivered at said building for the construction of said first floor, and that before the same was used and laid, the attention of the architect and of Mr. Wiegand, the general

manager of the plaintiff company, was called to examine the same, and that they, in the presence of Mr. Hemminghaus, inspected the same, or had the opportunity to inspect the same, and that the architect then and there said that the flooring and boards were all right and just as they wanted, and Mr. Wiegand heard the statement and made no dissent or objection thereto, and that thereupon the contractors used the same in laying said floor, then the plaintiff can not now complain about said flooring or boards with regard to anything or any defect which could be seen, or which could be discovered by the use of precautions or tests known to architects of ordinary skill and experience in this locality.

"Hence, though you should believe from the evidence that the lumber laid in the first floor of plaintiff's building was not seasoned or dry when laid, yet if you also believe from the evidence that plaintiff's architect inspected and approved the same before laid, and that by the use of precautions known to architects of ordinary skill and experience, in this locality, such architect would have discovered that such lumber was not seasoned or dry; and that the defendants, Hemminghaus & Vollmer, did not know of any wet or unseasoned condition of the lumber, then plaintiff can recover no damages which may have been caused by the fact that the lumber was not seasoned and dry.

"Hence, also, if you find from the evidence that such inspection was made by the architect as above supposed, then plaintiff can not in this case recover anything against the defendants upon the ground that the flooring lumber on the first floor of plaintiff's factory building was not four and one-half inches in width, or less than two inches in thickness, even though you should believe from the evidence that the same is more than four and one-half inches in width, or less than two inches thick.

"And so, though you may believe that the floor in

question may, after the laying thereof, have shrunk and warped, and become otherwise defective, yet if you also believe from the evidence that such result was brought about by causes other than the condition of the flooring when laid, or by the manner of laying the same, then plaintiff can not recover herein any damages by reason of such defects in the floor.

"2. If you believe from the evidence that the white oak tongued and grooved flooring and white oak boards used in the construction of the floor of the first floor of said factory building was not well seasoned when used, and that this was a defect in said material which could not be discovered by an architect of ordinary skill and experience by the use of such tests or means known to architects of ordinary skill and experience in this locality; and if you further believe from the evidence that the floor in question, by reason of the fact that such flooring and boards were not well seasoned (if you find such to be a fact), became uneven, warped and separated and so was of less value than it would have been had the lumber been well seasoned, then your verdict should be for the plaintiff.

"3. If, under the foregoing instructions, you find in favor of the plaintiff, you should so find in the penalty of the bond sued on in this case, viz., in the sum of forty-six thousand dollars, and you should assess the plaintiff's damages at such sum as you may find and believe from the evidence to be the fair and reasonable difference in value between the floor as laid, and in the condition the same was in on the 11th day of September, 1893, and the same would have been in if the floor in question had been constructed in the manner and of the kind and quality of materials called for in the specifications and contract read in evidence, with interest at the rate of six per cent per annum from that date (September 11, 1893) to this date.

"4. And, in arriving at the plaintiff's damages, you may take into consideration the difference (if you believe from the evidence that there is any difference) between the lasting and wearing qualities of the floor as laid, and the lasting and wearing qualities of a floor laid in accordance with the contract and specifications read in evidence.

"But in no event is the plaintiff entitled to recover any damages in this case on account of any defect in the floor which was brought about by causes other than the condition of the flooring when laid, or by the manner of laying of the same."

"5. On the other hand, if, under the evidence and the foregoing instructions you find in favor of the defendants, you need merely state in your verdict that you find the issues joined in this cause in favor of the defendants."

Under the instructions and the evidence the jury returned a verdict for the defendants.

After proper steps the cause was appealed to this court.

I. Learned counsel for plaintiff have cited numerous authorities to establish that the defendants were bound by their contract to furnish material of the kind required by their contract, and that their ignorance that the flooring was unseasoned will not excuse them although they acted in good faith; that the mere acceptance of a building without more, is not a waiver of defects, if latent; that an architect has no power to change the contract between the owner and the builder, and can not exceed the powers vested in him by the contract.

After a careful scrutiny of the evidence and the instructions of the court, it seems to us this appeal does not call for a discussion of these several propositions.

We must go to the pleadings in the first instance, to determine what was the issue in the circuit court. After the averment of the execution of the contract, and the portion as to which a breach is alleged, plaintiff proceeded to

state that the white oak flooring for the whole first floor was not furnished as required by the contract and that the defects therein and the failure of the lumber to measure up to the specifications were "not visible nor open to inspection, were latent and could not have been and were not known to plaintiff at the time said floor was laid nor at the time said building was completed and the final payment was made to defendants."

The defendants in their answer joined issue on this proposition and averred that before said white oak flooring was laid in said building it was fully inspected by the president and managing officer of plaintiff, and the architect who had full power to reject any and all material that should not be in strict accordance with said contract, and was accepted by them, and thereupon was incorporated into said building at great expense, and after said building was completed the whole was accepted.

On the trial, the evidence tended very strongly to sustain the answer, and the court framed its instructions with a view to the issue made and the testimony. The instructions concede that the contractors were bound to furnish the white oak flooring in accordance with the specifications and contract, but told the jury that if prior to the laying of said floor a controversy had arisen as to the character of the white oak flooring about to be used, and the architect exercising his right rejected it, and thereupon the defendants procured other white oak flooring for said building, and before using it submitted it to the inspection of Mr. Wiegand, the general manager of the plaintiff corporation, and to its architect, and that they in the presence of the defendants inspected it and then and there pronounced it all right, and just what they wanted, and thereupon the contractors, the defendants herein, used it in the making of said floor, then plaintiff can not now complain of anything or any defect in said lumber

which could have been seen, or by the exercise of the precautions or tests known to architects of ordinary skill and experience in that locality, could have been discovered. But on the other hand, if the defendants furnished material containing defects which could not be detected by observation and inspection by an architect of that vicinity of ordinary skill, then the contractors were liable though they acted innocently and though the building had been accepted and paid for.

As we understand the ruling of the circuit court, it was not that the architect could change plaintiff's contract to its detriment, but that it was entirely competent for plaintiff and said architect to determine that certain material offered to go into said building was just what the contract required, and having seen it and had the fullest opportunity of testing it, and it being material capable of being tested in various ways, all those defects which were visible or could when offered for inspection have been ascertained by an architect of ordinary skill in that vicinity, were waived by the acceptance of plaintiff and its architect.

The evidence tended to prove that the white oak flooring was first class material in every respect, save and except it is contended by plaintiff that it was not seasoned and hence it warped when it became dry. On the other hand, the lumber merchant who testified to twenty-five years experience in handling this character of timber, said it was seasoned and by natural process; that he could tell it by weight. Plaintiff's expert architect detailed a number of very simple tests that could have demonstrated whether the timber had been seasoned, and that the architect in charge of the building could have told it was unseasoned if in fact it was, "if he had had his wits about him." Under these circumstances, we think the circuit court announced the true rule. If the defects were visible and plaintiff saw them or he and his architect by the exercise of ordinary skill could have de-

tected the lumber was unseasoned when they were requested
by defendant to inspect and pass or reject it, and they ac-
cepted it, then they waived any defect in the flooring and
can not make it the basis of an action now.

The doctrine of waiver is a very familiar one, and we
think it applies to the facts found in this case. Williams
v. Railroad, 153 Mo. 487; Bishop on Contracts (1887), sec.
792.

Unquestionably plaintiff was entitled to have its factory
built of the material for which it contracted, but with this
right secured to it, and with full knowledge of the material
defendants offered for the flooring, it saw fit, not negatively
but affirmatively, to approve the lumber offered, and thus
led defendants to place it in the floor under the belief that
it fully satisfied the requirements of the contract.

It was not a case of mere silence, leaving defendants
at their peril to perform their contract, but plaintiff and its
expert asserted and assumed the right to inspect and reject
the material, and having rejected the first installment, ex-
pressly approved this. We think the court's first instruction
fully guarded plaintiff's rights, and correctly defined the rela-
tive rights of both plaintiff and defendant.

The learned counsel for plaintiff, moreover, is at fault
in the premise that the architect alone accepted the flooring.
The evidence is conclusive that the president of plaintiff
accompanied the architect and the two together in the pres-
ence of one of defendants after examination of the second
invoice of flooring, and before it was used, said it was the
very lumber they wanted. So that it will not do to argue
on this point, that the architect could not vary the contract.

The plaintiff and the chosen architect were authorized
to reject any material which in their judgment was not up
to the contract stipulations and by the same token they were
authorized to accept a specific material as being fully up to
the standard, if its defects were patent or by the exercise

of the ordinary care of ordinary architects they could have discovered the alleged defects and its unseasoned condition (if such there was) was unknown to defendants, then the acceptance by plaintiff must be held conclusive as to all but undiscoverable latent defects.

We have set forth the instructions in full, and deem it unnecessary to discuss each one separately. They announce correct principles of law, and were based upon the evidence.

The testimony justified the jury in finding that the lumber was seasoned, and its subsequent warping was the result of atmospheric conditions for which defendants are not responsible. Given a damp soil beneath and the artificial heat above, and it is not hard to produce the warp in white oak lumber shown by this testimony.

We think the verdict was for the right party, and the judgment is affirmed. *Sherwood* and *Burgess, JJ.,* concur.